UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
In re:                                                          Chapter 7

STEWART ADLER,                                                  Case No. 8-04-84807-reg
                                              Debtor.
-------------------------------------------------------------x

LISA NG and CHARMING TRADING COMPANY,           Adv. Proc. No. 8-05-08559- reg

                                              Plaintiffs,

                        -against-

STEWART ADLER,

                                              Defendant.
-------------------------------------------------------------x

## MEMORANDUM DECISION
(Interim ruling on piercing the corporate veil)


        Before the Court is the limited issue of whether the corporate veil should be pierced in

this case and the Debtor held liable for the debts of five related corporations, of which he was the

sole shareholder, officer and director.  The Plaintiffs hold a $2 million judgment against those

corporations.  They are seeking to establish the Debtor's liability for the corporations'

obligations, and if successful seek to have that obligation declared non-dischargeable under

section 523(a).[1]

        The Court recognizes the importance of preserving an owner's limited liability in the

corporate context.  However, there is a countervailing equitable principal which requires this

Court to pierce the shield that insulates individuals from the liabilities of a corporation so as to

prevent the shield from becoming a sword.  In order to succeed in piercing the corporate veil, the

---

[1]        The Plaintiffs also have objected to the Debtor's discharge under section 727(a), but
those claims are not specifically implicated by this interim ruling.

Plaintiffs must show that the Debtor "exercised complete domination of the corporation in respect to the transaction attacked" and "such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury[.]" *Morris v. State Dep't of Taxation & Fin.*, 82 N.Y.2d 135, 141 (1993).

The Court finds that in the context of his dealings with the Plaintiffs, the Debtor manipulated the corporations in an orchestrated scheme designed to insulate himself from liability and leave only under-capitalized shell entities that would never be able to pay their obligations. The Court also finds that the Plaintiffs were injured as a direct result of the Debtor's domination and conduct of the corporations. Thus, the Court finds that the Plaintiffs have sustained their burden of piercing the corporate veil to hold the Debtor liable for the debts of his corporations. The Court is not, at this time, determining the amount of the Debtor's liability.

### *Facts*

Prior to filing bankruptcy, the Defendant, Stewart Adler ("Debtor"), was the sole officer, director, and shareholder of several related corporations. Among those corporations were J.U.N.K. Jeanswear Corporation ("J.U.N.K."), Just Jeanswear Corporation ("Just I"), Just Jeanswear Corporation II ("Just II"), Just Jeanswear Corporation III ("Just III") and Seruchi Jeanswear Corporation ("Seruchi") (each referred to as a "Corporation," and collectively the

"Corporations")[2].  The Corporations were engaged in the business of importing and selling wholesale jeans and other garments into the United States.

The Plaintiff, Lisa Ng ("Ng"), was the principal of co-Plaintiff, Charming Trading Company ("Charming Trading") (collectively the "Plaintiffs").  From 1997 through 2000, the Debtor, through the Corporations, worked with the Plaintiffs to import garments from Hong Kong to the United States.  Originally, the Plaintiffs acted as the Corporations' agent for the purchase of merchandise from Hong Kong manufacturers.  This agency relationship changed and the Plaintiffs ultimately used their own credit to purchase merchandise and pay shipping costs.  Plaintiffs then invoiced the Corporations for the goods.  The Corporations failed to pay the Plaintiffs in full for the merchandise, which ultimately caused the Plaintiffs to default on their obligations to the Hong Kong manufacturers.

On July 25, 2003, Plaintiffs commenced a lawsuit against the Debtor and the Corporations in Supreme Court of New York County ("State Court") asserting claims based on, *inter alia*, breach of contract, fraud and piercing the corporate veil ("State Court Lawsuit").

While the State Court Lawsuit was pending, the Debtor filed a chapter 7 bankruptcy petition on July 28, 2004, and Andrew Thaler was appointed as chapter 7 trustee ("Trustee").  As a result of the Debtor's bankruptcy filing, on August 19, 2004, the State Court severed and stayed the State Court Lawsuit against the Debtor individually, including the cause of action seeking to pierce the corporate veil.  The lawsuit continued as against the Corporations only.

---

[2]    Only these five corporations are mentioned here because they are the judgment debtors relevant in this case.  The Court notes, however, that the Debtor has done business over the years through at least five other corporations:  Fresh New Clothing, Co. Inc., Fresh New Clothing II, Inc., J.U.N.K. Jeanswear Corporation II, J.U.N.K. Jeanswear Corporation III , and Stewart Sourcing & Manufacturing Co., Inc. *See* Exhs. 73 - 83.

According to the Debtor, the Corporations had no money to defend the lawsuit and for that reason they failed to comply with discovery demands.  The Corporations' answer was stricken, and they were found liable to the Plaintiffs by default.

Following the Corporations' default, the State Court conducted a six-day inquest on damages in June and July of 2005.  The Debtor appeared at the inquest on behalf of the Corporations.  During the inquest, the State Court admitted into evidence exhibits relating to the shipment of merchandise to the Corporations including purchase orders, invoices, bills of lading and other documents.  The State Court considered disputes between the parties relating to non-conforming goods and various claims for offsets or credits by the Corporations.  The State Court issued a written decision dated, August 4, 2005, making various findings relating to the business relationship among the Corporations, including that the Corporations were alter egos of each other, and their relationship with the Plaintiffs.  The State Court found that:

> Mr. Adler, acting on behalf of the defendant corporations and as their sole owner, placed orders and received shipments under the different corporate names, whichever had better credit or less debt at the moment.  Mr. Adler, on the corporations' behalf, authorized and approved all the styles and shipments. Whatever company name was on the order, the current existing companies all received the benefits and agreed to be responsible for the payments, based on the documents in evidence and plaintiff Ms. Ng's testimony.  The companies had the same owner, shared the same office spaces, tax number and equipment and were inadequately capitalized.  By clear and convincing evidence each defendant corporation was the alter ego of the others.

State Court Decision after Inquest and Assessment of Damages ("State Court Decision") at 2. The State Court also found that the Plaintiffs were damaged as a direct result of fraud committed by the Corporations at the direction of the Debtor.  According to the State Court,

> [P]laintiff Lisa Ng is entitled to an additional recovery as a direct result of the defendant corporations['] fraud on her. Mr. Adler, on behalf of the corporations,

represented to Ms. Ng that if she paid manufacturers and shipping and other costs to send the garments to the United States, his corporations would not only reimburse her but also pay past due commissions because the corporations had the present capacity to complete the transactions . . . .

The evidence shows that Mr. Adler and the corporations had no intention of carrying out these representations or the present capacity to do so. In reliance on these misrepresentations, Ms. Ng had a mortgage placed on her home, allowed companies to invoice to plaintiff Charming Trading Company, paid many of the invoices, was threatened when she could no longer pay, was sued in China and Hong Kong and fled to the United States. . . .  The credible evidence establishes that, as a direct result of the fraud and resulting debt  . . .  Ms Ng's total income loss caused by defendants' fraud is $209,675.

State Court Decision at 7.  Based on these findings, on September 14, 2005, the State Court entered a judgment (the "State Court Judgment") against the Corporations in the amount of $2,025,849.97.

On April 25, 2005, Plaintiffs filed an adversary proceeding against the Debtor, seeking to have their claim[3] against the Debtor deemed non-dischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A), (a)(4), and (a)(6); and seeking to deny the Debtor's discharge pursuant to 11 U.S.C. §§ 727(a)(2), (a)(3), (a)(4)(A) and (a)(5).

On December 18, 2006, the Plaintiffs filed a motion for summary judgment seeking judgment against the Debtor on the section 523(a)(2)(A) and 727(a)(4) causes of action.  By Order, dated June 13, 2007, the bankruptcy court granted the Plaintiffs' motion for summary judgment and granted nondischargeability under 11 U.S.C. §523(a)(2)(A), giving collateral estoppel effect to the State Court Judgment.  The bankruptcy court found that even if collateral

---

[3]     At the time the adversary proceeding was filed this was a no-asset case; there was no bar date for the filing of claims, and thus no claim was filed.  The Debtor did, however, schedule the Plaintiffs with a disputed claim of approximately $9.1 million, subject to setoff, both in the original schedules filed with the petition, and in amended schedules filed on November 15, 2010.

estoppel were not appropriate under the circumstances, "it seems . . . independently the judge's findings in state court would be admissible and are admissible in this summary judgment, and I think as a matter of law the debtor's claim that a stay prevented this from happening is not correct, and . . . once those findings are in . . . it's very clear to me that we now follow the necessary elements for 523(a)(2)(A), and that the claim . . . which I believe exists, . . .. will be excepted from discharge." Transcript ("Tr.") 6/13/07 at 21-22. The bankruptcy court also denied the Debtor's discharge under section 727(a)(4), finding that the undisputed facts surrounding omissions and inaccuracies in the Debtor's schedules and statements gave rise to a claim to deny the discharge as a matter of law. The Debtor appealed.

On appeal, the District Court reversed and held that the State Court findings against the Corporations should not be given preclusive effect against the Debtor as an individual in this adversary proceeding. *Adler v. Ng (In re Adler)*, 395 B.R. 827, 830 (E.D.N.Y. 2008). The District Court also found that if the State Court findings *were* found to be binding upon the Debtor under an alter ego or veil piercing theory, then those findings would be void *ab initio* as having been entered in violation of the section 362(a) stay. *Id.* at 839-40; *see also Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 527-28 (2d Cir. 1994). Specifically, the District Court found:

> The Bankruptcy Court erred in giving collateral estoppel effect to the state court findings because Debtor was severed from the case when he filed for bankruptcy and, therefore, did not have a full and fair chance to litigate the issues in the state court proceeding. Contrary to plaintiffs' suggestion that Debtor participated in the state court proceeding because he appeared as a representative of the company, Debtor did not participate in the state court action in his individual capacity and any such participation would have violated the automatic stay. Therefore, if the state court's findings of fraud are made binding against the Debtor with respect to any alleged debt owed to plaintiffs, those findings would violate the automatic stay and would be void *ab initio*.

*Adler*, 395 B.R. at 830.  The District Court also found that genuine issues of material fact existed

with respect to the section 727(a)(4) claim which should be resolved at trial rather than on

summary judgment.  The District Court remanded the case for further proceedings on the merits

of the Plaintiffs' section 523 and 727 claims, and also on the matter of whether the Plaintiffs held

a valid claim against the Debtor, and if so, in what amount.  *Id.* at 841 n.10.

On October 15, 2008, the Trustee filed a notice of discovery of assets and January 16,

2009 was set as the last day to file proofs of claim.  On February 28, 2009, the Plaintiffs filed a

late proof of claim against the Debtor in the amount of $2,025,841.91, i.e., the full amount of the

State Court Judgment against the Corporations.[4]  Shortly thereafter, the Debtor filed an objection

to the Plaintiffs' proof of claim arguing that the Debtor has no personal liability for the debts of

the Corporations ("Claim Objection"), thus raising the issue of whether the corporate veil should

be pierced to hold the Debtor liable for the Corporations' debts.

This Court scheduled a combined evidentiary hearing on the Claim Objection and trial on

the adversary proceeding to commence September 20, 2010.  The proceedings were combined so

that the Debtor's liability could be established, or not, prior to or contemporaneous with, a ruling

on whether such liability should be non-dischargeable.  The Plaintiffs' claims for repayment by

the Debtor are based on two theories: primarily, they claim that the Debtor should be held liable

for the debts of the Corporations under a veil-piercing theory; secondarily, they argue that the

---

[4]      Only one other proof of claim was filed in this case, by New York State Department of Taxation and Finance, in the amount of $3,518.87 for administrative (post-petition) tax liabilities.  The fact that the Plaintiffs' claim was late-filed does not affect their status as a creditor.  *See* 11 U.S.C. §726(a)(3).

Debtor has separate liability based upon his personal promise to pay the corporate debts to Plaintiffs.

The proceedings commenced on September 20, 2010 and continued for seven non-consecutive days until February 3, 2011.  The Court heard testimony by the Debtor, Ms. Ng, and the Corporations' accountant, Mr. Portnoy, and admitted Plaintiffs' Exhibits 1 - 86, 91, 92, 95, 96, and Debtor's Exhibits A - Q, S and U - W, into evidence without objection.[5]

On February 3, 2011, prior to the conclusion of the Plaintiffs' case, the Court determined, with the agreement of the parties, that it would be the best course of action to adjourn the trial without date so that the Court could rule on the threshold issue of whether the corporate veil should be pierced such that the Debtor should be liable for the Corporations' debts.  The parties filed post-trial memoranda of law on March 25, 2011, at which time the matter was taken under submission.  Piercing the corporate veil is the sole focus of this Memorandum Decision.

### *Discussion*

As a general rule, a corporation exists independently of its owners as a separate legal entity and a corporation's owners are not liable for the debts of the corporation. *See Anderson v. Abbott*, 321 U.S. 349, 361-63 (1944); *Morris v. State Dep't of Taxation & Fin.*, 82 N.Y.2d 135, 140 (1993).  Formation of a corporation by its owner for the purpose of limiting liability of the owner is perfectly legal and valid.  *Morris*, 82 N.Y.2d at 140.  However, New York courts will disregard the corporate form, or pierce the corporate veil, to hold a corporation's owners liable

---

[5] In the amended joint pretrial memorandum, dated September 20, 2010, the parties stipulated that Plaintiffs' Exhibits 1 - 86, and Debtor's Exhibits A - P were admissible unless objected to on the grounds of relevance.  No objections to relevance were raised or upheld during the trial and all of those exhibits were admitted.

for the debts of the corporation whenever necessary to prevent an injustice or to achieve equity.

*Id.* at 142.

Under New York law, a party seeking to pierce the corporate veil bears the burden of showing that "(1) the owners exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury[.]" *Id.* at 141. "The party seeking to pierce the corporate veil must establish that the owners, through their domination, abused the privilege of doing business in the corporate form to perpetrate a wrong or injustice against that party such that a court of equity will intervene." *Id.* at 142.

The Second Circuit has enumerated a non-exhaustive list of factors relevant to determining whether a corporation has been "dominated" by its owners:

> (1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, *i.e.*, issuance of stock, election of directors, keeping of the corporate records and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arms length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and (10) whether the corporation in question had property that was used by other of the corporation as if it were its own.
>
> *Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*, 933 F.2d 131, 139 (2d Cir. 1991).

No one factor is determinative and courts must conduct a broad-based inquiry into the totality of the facts to determine whether the party seeking to pierce the corporate veil has established the

domination prong of the test. *See id.*; *see also Pergament v. Precision Sounds DJ's, Inc. (In re Oko)*, 395 B.R. 559, 564-65 (Bankr. E.D.N.Y. 2008) (finding defendant abused the corporate form based on the totality of the circumstances).

Under the second prong of the New York standard, the party seeking to pierce the corporate veil must also establish that the domination was used to commit "a wrongful or unjust act toward the plaintiff" which caused injury to the plaintiff. *Morris*, 82 N.Y.2d at 141-42. Actual or common law fraud need not be proven. *See DER Travel Servs. v. Dream Tours & Adventures*, No. 99-2231, 2005 WL 2848939, at *9 (S.D.N.Y. Oct. 28, 2005). A plaintiff may be considered "injured" by the defendant's actions when "a company is rendered unable to pay the claims pending against it by third parties because of another company or individual's domination of the business." *Balmer v. 1716 Realty LLC*, No. 05-839, 2008 WL 2047888, at *6 (E.D.N.Y. May 9, 2008) (citing *Austin Powder Co. v. McCullough*, 216 A.D. 825, 827 (N.Y. App. Div. 1995)); *see also DER Travel Servs.*, 2005 WL 2848939, at *11 (citing *JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.*, 306 F.Supp.2d 482, 486 ("stripping of corporate assets by shareholders to render the corporation judgment proof constitutes a fraud or wrong justifying piercing the corporate veil[]")).

The Court will first analyze the "domination" element of piercing using the factors set forth in *Wm. Passalacqua Builders*, 933 F.2d at 139.

### Absence of corporate formalities

The Plaintiffs argue that the Debtor failed to produce stock certificates for the Corporations; and the Corporations held no board of director meetings, kept no corporate

minutes or other evidence of corporate formalities, kept no financial records, did not file

corporate tax returns until after they ceased doing business and after the State Court litigation

was commenced, and did not issue W-2 or 1099 tax forms to employees and independent sales

people.

The Debtor claims that he "did his best" to adhere to corporate formalities in that each

Corporation was separately incorporated by an attorney, each had its own employer

identification number, a separate bank account with its own corporate checks, its own letterhead

and a separate factoring agreement.  The Debtor admits that he never issued stock to himself, he

failed to retain the original corporate kits from the time of incorporation, and the Corporations

held no board meetings.  According to the Debtor, each Corporation—under their separate

corporate names—received separate monthly factoring statements, invoices and purchase orders,

and issued separate corporate invoices to customers.  He also testified that he hired a bookkeeper

to keep the books of each Corporation separately and add a layer of oversight.  The Debtor

claims that the Corporations' accountant, Mr. Portnoy, prepared "review statements" for the

Corporations every six months to a year which was required by the factors.

Although the Debtor claims that contemporaneous financial reports were prepared by the

Corporations' bookkeeper, he never produced those records in connection with this litigation and

did not produce the bookkeeper as a witness at trial.  In 2004 or 2005, at least four years after the

Corporations ceased operations, the Debtor asked Mr. Portnoy to re-create the Corporations'

financial statements for litigation purposes.  Tr. 9/22/10 at 44.  Mr. Portnoy testified that he

created his analyses using only check stubs, and other information provided to him by the

Debtor, but he had no means of independently verifying any of the information, Tr. 9/22/10 at

88-95, and audits were not performed.  Tr. 9/22/10 at 31.  The Debtor did not provide him with the alleged contemporaneous records kept by the Corporations' bookkeeper, or the Corporations' banking records.

Mr. Portnoy testified that tax returns were never prepared for at least two of the Debtor's wholly-owned corporations.  According to his testimony, the Debtor "opened and closed companies very frequently" and since the companies did not make a profit, it was not worth it to file a tax return.  Tr. 9/22/10 at 42-43.  He also testified that the Corporations' "bookkeeper never put the books together completely to file the tax return."  Tr. 9/22/10 at 42-43.  Mr. Portnoy testified that the 1998 through 2000 tax returns were only prepared for Just I, Just II and Just III, for litigation purposes, in December of 2004—long after those Corporations ceased operations.  Tr. 9/22/10 at 43-44; Exhs. 53-59.  Mr. Portnoy testified that he prepared the tax returns based upon information provided to him by the Debtor, and his own "estimates," and he had no personal knowledge of whether the information contained in the returns was correct.  Tr. 9/22/10 at 47-49.  According to the tax returns and the other financial analyses prepared by Mr. Portnoy for Just I, Just II and Just III, none of those Corporations had annualized net operating profit from 1998 through 2000.  Exhs. 53-59 and Q.

The general ledgers of Just I, Just II and Just III, prepared by Mr. Portnoy in 2004/2005, contain entries for payment of payroll expenses and/or commissions to at least five individuals, including the Debtor.  Exhs. E, F and G.  However, Mr. Portnoy testified that the Corporations did not issue W-2s or 1099s to any employee or independent contractor, including the Debtor. When asked why the Corporations did not issue income tax forms, he replied, "It was just never done.  I can't give you a forthright answer."  Tr. 9/22/10 at 120.

In addition, while the evidence shows that the Corporations did keep separate checking accounts and separate factoring arrangements, Exhs. A, B and H, the evidence also shows that the Debtor, at times, directed the invoices of one Corporation to be paid by another, and the overhead for all of the Corporations, at times, to be paid by a single Corporation.  *See discussion infra*.

The Court understands that in the context of closely-held corporations, corporate formalities are more relaxed than in a large public corporate setting, and this should be taken into consideration as a factor in the "domination" analysis.  *See Directors Guild of Am., Inc. v. Garrison Prods., Inc.*, 733 F.Supp. 755, 760 (S.D.N.Y. 1990) (citing *William Wrigley Jr. Co. v. Waters*, 890 F.2d 594, 601 (2d Cir. 1989)).  It is, however, clear that in the instant case the Corporations, under the sole control of the Debtor, failed to exercise even the most basic corporate formalities of contemporaneous bookkeeping, maintenance of financial records, issuance of income tax forms to employees and independent contractors, and the filing of timely tax returns.  Standing alone this fact would not necessarily be dispositive of the issue.  However, this is not the only factor weighing in Plaintiffs' favor, and the Court's analysis continues.

### Inadequate capitalization

The Plaintiffs maintain that the Corporations were inadequately capitalized.  It is uncontroverted that the Corporations' operations were funded mainly on factor financing guaranteed by the Debtor.  According to the Plaintiffs, neither the factor financing arrangement, nor the Debtor's personal guaranty of the factor financing, constitute adequate capitalization.

The Debtor argues that the funding of the Corporations through factor arrangements, common in the industry, constitutes "adequate capitalization."  According to the Debtor, each of the Corporations had a separate factoring agreement with purchase order financing and letters-of-credit to fund the purchase of merchandise.  The Corporations' factors would take an assignment of the Corporations' account receivable, and either pay the manufacturer directly or issue a letter of credit to cover payment for merchandise.  When goods were delivered, and the accounts receivable paid, the factor would deduct a percentage and forward the balance to the Corporation.  At no time did the Corporations contribute any of its own capital towards purchases.  In fact, the Corporations had no capital.  In addition to the factoring arrangement, the Debtor cites to his accountant's testimony that the Debtor contributed funds to the Corporations for costs of incorporation, attorney fees and other start up costs as further evidence of adequate capitalization.  Finally, the Debtor argues that the Plaintiffs were aware of the manner in which the Corporations were financed and did business with the Corporations on that basis for several years.  *See Brunswick Corp. v. Waxman*, 599 F.2d 34, 36 (2d Cir. 1979) (finding that plaintiff knew or should have known that the corporation's principal intended to avoid personal liability).

Inadequate capitalization is integral to the veil-piercing analysis, particularly in the context of a closely-held corporation.  *See Anderson v. Abbott*, 321 U.S. 349, 362 (1944) ("An obvious inadequacy of capital, measured by the nature and magnitude of the corporate undertaking, has frequently been an important factor in cases denying stockholders their defense of limited liability."); *see also DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.*, 540 F.2d 681, 684-85 (4th Cir. 1976).  The benefit of limited liability for corporate shareholders does not come without responsibility.  Typically, corporations which are undercapitalized in such a

way as to ensure that entities doing business with the corporation will have no way to recover

damages against the corporation, will not receive the benefit of limited liability.

> To permit the creation of an inadequately capitalized corporation as a separate
> entity is incompatible with the concepts underlying an independent existence.
> Where it is sought on the one hand to make available to general or tort creditors
> only an illusory amount compared with the size of the business and the public
> responsibility inherent in its very nature, while on the other hand advancing
> necessary expenses through secured devices, it would be a gross inequity to allow
> such a flimsy organization to provide a shield for personal liability. Courts will
> not tolerate arrangements which throw all the risks on the public and which
> enable stockholders to reap profits while being insulated against losses.

*Mull v. Colt Co.,* 31 F.R.D. 154, 164-65 (S.D.N.Y. 1962) (denying motion to dismiss).

The Debtor relies on the factor financing to constitute adequate capitalization.  However,

financing, by its very nature, is not capital.  *See Wm. Passalacqua Builders, Inc. v. Resnick*

*Developers South, Inc.*, 933 F.2d 131, 139-140 (2d Cir. 1991) (finding funds loaned to the

corporation, and personally guaranteed by principal, did not constitute "adequate capitalization")

(citing Fletcher, Cyc. Corp. §§ 5079-5080.1 for the definition of "capital" of a corporation).  A

corporation's "capital" is defined as "the money, property or means contributed by stockholders

as the fund or basis for the business or enterprise for which the corporation was formed. The

term  generally implies that such money, property or means have been contributed in payment

for stock issued to the contributors."  *United Grocers, Ltd. v. United States*, 186 F. Supp. 724,

729 (N.D. Cal. 1960).

The Debtor's argument that he contributed capital to the Corporations in that he paid for

the initial start up costs to incorporate the Corporations, also fails.  Such contributions do not

constitute "capital."  Rather, the funds were contributed for start up costs, not to fund operations

of the Corporations.  The Debtor admits that he invested none of his own money or capital to the Corporations from 1997 through 2000.  Tr. 9/21/10 at 88-89.

In addition to the Debtor's failure to contribute capital to the Corporations, the evidence prepared by the Debtor's accountant shows that the Corporations never realized an annualized net operating profit, and were likely at all times, insolvent.  This fact weighs in the Plaintiffs' favor.  *See Atateks Foreign Trade v. Private Label Sourcing, LLC*, 402 Fed. Appx. 623, 626 (2d Cir. 2010) (fact-finder may also consider insolvency in determining whether to pierce the corporate veil) (citing *William Wrigley Jr. Co. v. Waters*, 890 F.2d 594, 601 (2d Cir. 1989)).

The Court is unpersuaded by the Debtor's argument that the Plaintiffs knew or should have known the nature of Corporations' finances and did business with the Corporations at their peril.  There is evidence in the record, discussed *infra*, that on more than one occasion the Debtor assured the Plaintiffs that they would be paid, and those assurances were made in order to induce the Plaintiffs to continue to do business with the Debtor and his Corporations.  *See DeWitt*, 540 F.2d at 686 n.18.

Based upon the foregoing, the Court finds that the Corporations were inadequately capitalized and this factor will weigh heavily in favor of piercing the corporate veil.


***Personal use of corporate assets***

The Plaintiffs argue that the Debtor utilized the Corporations' assets for his personal benefit.  The Plaintiffs cite to evidence showing that the Corporations issued numerous checks to, or for the benefit of, the Debtor and his wife, Cindy Speiser, who was not an employee of the Corporations.

The Debtor does not dispute that corporate checks were issued to Ms. Speiser; nor does he dispute that Ms. Speiser was not an employee of the Corporation entitled to wages. By way of explanation, the Debtor testified that during the time he did business with the Plaintiffs continuing up to the time he filed bankruptcy in 2004 he did not have a personal bank account and did not hold any assets in his name. Tr. 9/20/11 at 78-84. This was done intentionally and as a result of an acrimonious divorce from his first wife and certain problems with the Internal Revenue Service. Tr. 9/21/11 at 162-167. He also did not have any credit, nor did his Corporations have sufficient credit to obtain financing to fund operations. Tr. 9/20/11 at 145. For this reason, his wife, Cindy Speiser, functioned as a "credit line" of sorts paying for business expenses and receiving reimbursement from the Corporations. According to the Debtor, additional funds were deposited into Ms. Speiser's bank account, either via checks made out to him, cash or Ms. Speiser, which represented the Debtor's salary. According to the Debtor, Ms. Speiser, in turn, would pay the Debtor's personal expenses from those funds. In defense of this practice of passing funds through Ms. Speiser's bank account, the Debtor claims that all of the transfers to Ms. Speiser were documented and all corporate funds accounted for. Tr. 9/20/11 at 142-46.

The Court is not aware of any evidence of contemporaneous records which document the exact nature of the funds that were paid to Ms. Speiser and "Cash" by the Corporations' and thus there is no way of verifying that these were valid corporate expenses. As discussed later in this Decision, the Debtor did not maintain any contemporaneous books or records of the Corporations except for a check register. Likewise, the Debtor did not produce any loan documents or other written evidence of the arrangement that the Debtor describes. In total, from

1998 to 2000, almost 100 checks were written to Ms. Speiser or to cash, mostly in amounts varying from $1,000 to $3,000 each, from Just I, Just II and Just III, totaling over $150,000. The Court finds that this method of corporate accounting by the Debtor, at best, is evidence of the Corporations' failure to observe corporate formalities normally associated with the payment of salaries and/or commissions and the extension of credit or loans to a corporation. At worst, it suggests that the Debtor directed corporate funds to his wife for improper purposes. The Court is not prepared to find that such is the case. However, the arrangement with Ms. Speiser does demonstrate the Corporations' failure to observe the most fundamental corporate formalities. The Debtor's system of using his wife's credit for corporate purposes and repaying her from corporate funds, appears to have been orchestrated solely for the Debtor's benefit, not the benefit of the Corporations. Tr. 9/22/10 at 120-127. As such this factor weighs in favor of piercing the corporate veil.

### *Overlap in ownership, officers, directors; common office space, address and telephone numbers; amount of business discretion displayed by the allegedly dominated corporation*

It is undisputed that the Debtor was the sole owner, officer, employee and director of each of the Corporations, and the Corporations all operated out of the same office and had the same telephone and fax numbers. It is also undisputed that the Debtor was the sole decision-maker for the Corporations.[6] Tr. 9/21/10 at 100. However, in the case of closely-held corporations these facts are not uncommon, and often create a scenario where a sole principal dominates corporate decision-making. As such, these facts are neutral in the context of closely-

---

[6]     A discussion of whether the Debtor dealt with the Corporations at arms' lengthy would be directly related to Debtor's role as sole officer, employee and director of the Corporations.

held corporations and are not enough to pierce the corporate veil.  *See Wrigley*, 890 F.2d at

601(application of domination factors to small privately held corporations can be difficult

"where the trappings of sophisticated corporate life are rarely present").  These factors must be

considered in the context of other factors showing domination of the Corporations by the Debtor,

and the abuse of "the privilege of doing business in the corporate form to perpetrate a wrong or

injustice" against the Plaintiffs.  *See Morris v. State Dep't of Taxation & Fin.*, 82 N.Y.2d 135,

142 (1993).


***Whether the Corporations were treated as independent profit centers[7]***

The Plaintiffs argue that the Corporations were not treated as independent profit centers,

but rather the evidence shows that the Debtor transferred assets among the Corporations without

documentation, and orders were placed and shipments received and paid for under different

corporate names depending on which had better credit at the time.  The Plaintiffs also argue that

the Debtor caused the assets of the Corporations to be cross-pledged without regard to any

benefit received by the respective Corporation.

The Debtor believes that the Corporations were treated as independent profit centers and

were operated in conformity with regular practices in the garment industry.  This is especially so,

he argues, because the Corporations' factors "highly scrutinized" the operations of each

Corporation.  The Debtor claims that when funds were transferred among Corporations, the

transaction was noted and recorded in the books and records of the affected Corporation.

---

[7]     This factor and the last factor, i.e., whether the corporation in question had property that
was used by other of the corporations as if it were its own, are similar and will be
combined into one discussion.

According to the Debtor, the letters of credit matched purchases orders and the amounts to be paid on the purchase orders, and the Corporations could not split purchase orders, invoices or accounts receivable; nor could the Corporations choose which Corporation would pay.

Whether the Corporations were treated as independent profit centers with respect to each other is not the critical issue. The Plaintiffs are seeking to pierce the corporate veil to hold the Debtor liable for Corporations' debts, not to hold each of the Corporations liable for the debts of the other. The issue is whether the Debtor, through his domination and control of the Corporations, created a network of entities that were never intended to be independent profit centers.[8] This Court finds that such is the case in the matter at hand.

First, the Debtor admittedly assured the Plaintiffs that they would be re-paid what they were owed from the Corporations' operations, regardless of which of the Corporations owed the money. Exhs. 13, 14 and 27; Tr. 9/21/10 at 24-25, 90. Second, the Debtor allocated invoices and shifted liabilities among the Corporations without regard to which Corporation issued the original purchase order. For example, in 1997 when the Debtor's corporation, Fresh New Clothing, Co., Inc. ran into unexpected liability from a lawsuit against it, the Debtor shifted Fresh New Clothing's outstanding invoices over to Just I and asked the Plaintiffs to issue a duplicate invoice to Just I, instead of Fresh New Clothing, for the exact same goods. Exh. 7; Tr. 9/20/19 at 175-79. Despite moving the invoice over to Just I, the Debtor directed payments on the invoice to be made by Fresh New Clothing, thus transferring the asset but not the liability from Fresh New Clothing, to Just I. Exh. 7. With respect to a different shipment, the Debtor

---

[8]     The State Court already determined that the Corporations are alter egos of each other. Although this Court has not yet decided the preclusive effect of the State Court Judgment in this proceeding, the Court finds that the facts presented in this proceeding would also be sufficient to establish that the Corporations are alter egos of each other.

admitted that payment on a single invoice was made by three different entities, Just I, Just II and Just III. Tr. 9/21/10 at 19-20. When asked why three different entities made payment on one shipment, the Debtor responded "[S]ince I was the principal . . . of the company – the – the corporations, I was able to allocate the monies where they would go with the factor. When monies came in, a lot of the receivables the factor would tell me how much availability would be available and I would have the capabilities of directing the funds to the receivables or the payables of the accounts." Tr. 9/21/10 at 110. This directly contradicts the Debtor's argument that the Corporations' each maintained a separate identity which was monitored and ensured by the factoring arrangement. Third, the Debtor also testified that he did not allocate overhead expenses equally among the Corporations. Rather, he would pay overhead expenses from whichever Corporation had funds to pay the expense at the time. Tr. 11/17/10 at 43.

The Court finds that this factor also weighs in favor of piercing the corporate veil.


### Payment or guarantee of debts of the Corporations by the Debtor

It is undisputed that the Debtor personally guaranteed the Corporations' obligations to the factors. In addition the Plaintiffs allege that the Debtor personally promised to pay the Corporations' obligations to the Plaintiffs, Exhs. 13 and 27, and this fact should weigh in favor of piercing the veil.[9] The Debtor denies having guaranteed payment of the Corporations' obligations to the Plaintiffs.

---

[9]     Although it is not part of this Memorandum Decision, the Plaintiffs have argued, under a separate theory, that the Debtor should be held liable on an alleged personal promise to pay the Corporations' debts.

Exhibits 13 and 27 were introduced into evidence to support the Plaintiff's position.  The first page of Exhibit 13 is a handwritten note on Just I letterhead, from the Debtor to Ng, "re: Charming Trading", in which the Debtor wrote, "As per agreement Just Jeanswear Corporation will be responsible to Charming Trading all open invoices to Just Jeanswear Corp.  All companys labels Junk, Defrost and Avirex[10] will be responsible for payment due Charming Trading."  The next page of Exhibit 13 is a similar handwritten note from the Debtor which appears to have been sent to Ng in November 1998.  In that letter, the Debtor gives Ng assurances that she will be paid by the factor, Geneva Capital.  He wrote, "You do not understand how the factor works . . .  Geneva Capital gives you all available monies advanced and collected.  They only deduct interest and payroll.  You get all the balance of monies collected."  Later in that letter the Debtor wrote "I will pay you back from both company's ... Junk, Defrost & Avirex."  He then wrote, "You must try to get a 30% discount from the factories.  If you have to lie to them do it ??  Tell them the quality is bad, the goods are late and unsaleable.  Mr. Adler has to give a 30% discount to customer. . . ."  Finally, he writes, "As long as I am in business I will pay you all your money." Exh. 13.  Exhibit 14 is a letter, dated December 9, 1998, from the Debtor to Ng on "J.U.N.K. Jeans/Defrost Jeans" letterhead which contains further assurances of repayment.  The Debtor stated that, "all our corporations involved with J.U.N.K., Defrost, and Avirex licensee will be responsible to pay back the open invoice due Charming Trading.  . . . Please be advised that we want to continue to do business with Charming Trading . . .  I hope this will relieve the tension a little.  I will not hurt our 20-year

---

[10]     Avirex is a brand of clothing that the Debtor manufactured under a licensing  agreement. Defrost is another brand of clothing that the Debtor hoped to obtain a license to sell, but never did.  Tr. 9/21/10 at 33.  The Debtor allegedly set up separate corporations under which to sell these brands, at the behest of the factor.  Tr. 9/20/10 at 52, Tr. 9/21/10 at 34.

relationship. . . ." Exhibit 27 is another handwritten letter from the Debtor to Ng, dated in March 1999. In that letter, the Debtor wrote, "I don't want to be threatened by you or any of the suppliers you owe money to. I owe Charming Trading the money. I don't know how much you personally owe out. But I am trying to develop a concept to pay you back through L/C's & cash. I want to continue to do business with you but it can only be done on L/C's & cash." In the letter, the Debtor then expressed concerns about some merchandise he was not able to sell, but stated "I am not complaining about it, but we have to work together to get rid of these problems. You might have to go to your family to pay the people who threaten you. I will still pay you back all the money I owe you." The Plaintiffs' summary of invoices and payments by the Corporations, which was admitted into evidence without objection, Exh. 12, shows that after the Debtor's letters to Ms. Ng, there were three additional shipments which totaled over $300,000, for which the Corporations did not pay at all. In June 1999, the Corporations were in arrears to the Plaintiffs in the amount of $921,000, and this was admitted by the Debtor. *See* Exhs. 12, 29; Tr. 9/17/10 at 81, 94-96; Tr. 9/21/10 at 61-63; Tr. 11/17/10 at 34-35; Tr. 2/4/11 at 57-60.

While it is not necessary to decide the issue at this point, it appears that the Debtor's promises of repayment alone would not rise to the level of an enforceable personal guarantee. However, when considered in the context of the Plaintiffs' efforts to pierce the corporate veil, the Debtor's promise to pay, whether individually or by the Corporations as a whole, is persuasive evidence of the Debtor's domination of the Corporation and weighs in favor of piercing. *See DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.*, 540 F.2d 681, 686 n.18 (4th Cir. 1976) ("where the individual operator has used as persuasion upon the creditor that he

stood personally behind the corporation and would see that its indebtedness was paid has been found in some cases to justify holding the individual defendant to his promise.").

Based on the totality of the record these factors weigh heavily in favor of finding that the Debtor dominated and controlled the Corporations. However, as discussed earlier in this Decision, domination of the Corporations is not enough to pierce the veil. The Plaintiffs must also show that the Debtor's domination was used to commit "a wrongful or unjust act toward the plaintiff[.]" *Morris v. State Dep't of Taxation & Fin.*, 82 N.Y.2d 135, 141-42 (1993).

### *Wrongful or unjust acts toward Plaintiffs*

The Plaintiffs allege that the Debtor exercised his domination over the Corporations to harm, or worse, to defraud them. They argue that the Debtor siphoned the factor financing from the Corporations to pay his personal expenses leaving the Corporations unable to satisfy their obligations to the Plaintiffs. The Plaintiffs argue that the Debtor's accountant could not account for hundreds of thousand of dollars received by the Corporations from the factors and other sources, including retailers who allegedly paid the Corporations directly. A direct result of the Corporations being unable to pay the Plaintiffs was the Plaintiffs default on their obligations to the Chinese manufacturers. The Plaintiffs argue that the Debtor falsely represented that they were being retained as an agent for the Corporations, and fraudulently induced them to issue invoices to the Corporations to make it appear that Charming Trading was the purchaser of goods and primarily liable to Chinese manufacturers. According to the Plaintiffs, it was only at the Debtor's insistence that Charming Trading purchased merchandise on its own credit and

issued invoices to the Corporations.  The Plaintiffs contend that the Debtor falsely represented to the Chinese manufacturers that the Corporations paid the Plaintiffs for goods that were shipped by the manufacturers, and it was the Plaintiffs who were liable.  Ng allegedly borrowed significant sums of money from her family and mortgaged her home in order to pay the manufacturers but was unable to pay them in full and ultimately was sued and allegedly forced to flee her home in Hong Kong after she received threats to her personal safety.  The Plaintiffs allege that the Debtor continually and falsely represented to them that they would be paid which induced them to continue to do business with the Debtor and the Corporations.

The Debtor maintains that even if the Plaintiffs are able to prove that the Debtor dominated the Corporations, they have not proven that in so doing the Debtor committed a fraud or wrong which resulted in an injury to them.  According to the Debtor, the Corporations have valid offsets to payment which is the cause of the Corporations' failure to pay the Plaintiffs for goods shipped, and this is a simple breach of contract case.  Despite couching this as a breach of contract case, the Debtor argues that the Plaintiffs should have at all times been acting as the Corporations' agent to purchase goods from the Chinese manufacturers, with sole liability being on the Corporations.  Tr. 9/21/10 at 111.  The Debtor testified that Ng took it upon herself to purchase the goods directly from the Chinese manufacturers, rather than as the Corporations' agent, so that she could make a larger commission.  Tr. 9/21/10 at 111.  The Debtor claims that Ng is a sophisticated businesswoman who has been employed in the garment industry for years handling millions of dollars worth of business.  The Debtor argues that she was well aware of the Corporations' capitalization and financing and well aware that she was doing business with the Corporations, not the Debtor individually.  *See Brunswick Corp. v. Waxman*, 599 F.2d 34, 36 (2d

Cir. 1979) (finding that plaintiff knew or should have known that the corporation's principal intended to avoid personal liability).

The record in this case is barren of any documentary evidence which would prove either parties' version of how it came to be that Charming Trading issued invoices to the Corporations, despite its alleged role as agent of the Corporations. However, the Debtor contradicted his own testimony that it was Ng who decided to issue invoices to the Corporations. He testified that it was *his* preference that the Plaintiffs make the deal with the manufacturers and issue invoices to the Corporations, which, in theory, the Corporations would repay so that Charming Trading could pay the manufacturers. Tr. 9/20/10 at 174-75.

There is also evidence which tends to show that the Debtor and his Corporations did not interact with the Plaintiffs in a manner which is consistent with a principal/agent relationship. Although the Debtor claimed that the Corporations were primarily liable to the Chinese manufacturers, he also denied such liability and shifted the burden of repayment to the Plaintiffs. For example, in his handwritten note to Ms. Ng, dated in March 1999, the Debtor stated, "I don't want to be threatened by you or any of the suppliers *you owe money to*. I owe Charming Trading the money. I don't know how much you personally owe out. But I am trying to develop a concept to pay you back through L/C's and cash. I want to continue to do business with you but it can only be done on L/C's & cash. . . . You might have to go to your family to pay the people who threaten you. I will still pay you back all the money I owe you." Exh. 27 (emphasis added). It is also inconsistent with a principal/agent relationship that when one of the Chinese manufacturers came to New York to seek payment of outstanding invoices from the Corporations, the Debtor told that manufacturer that he already paid Charming Trading for those

goods and they should seek repayment from Ng.  Tr. 11/17/10 at 19-26.  In addition, although the Debtor testified that he did not know why the Plaintiffs, as the Corporations' agent, paid for the goods shipped by the Chinese manufacturers, Tr. 9/21/10 at 26, at no time in the correspondence indicated in Exhibits 13, 14 and 27, did the Debtor, on behalf of the Corporations, admonish the Plaintiffs for taking on a role inconsistent with their agency relationship; rather, he encouraged it.

To put this in some context, at the time the Plaintiffs and the Debtor ceased doing business with each other, the Corporations had purchased approximately $2.3 million worth of merchandise from, or through, the Plaintiffs, in seventeen different shipments and only paid for approximately one-half of that merchandise.  Tr.  9/21/10 at 67; Exh. 12.  The Debtor admits that the Corporations received approximately $4.4 million from their factors during that time period, but instead of paying the Plaintiffs, he used those funds to pay other suppliers and overhead expenses.  Tr. 9/21/10 at 77-80.

During late 1998 and early 1999, the Debtor, on behalf of the Corporations, repeatedly gave the Plaintiffs assurance that they would be paid what they were owed.  *See* Exhs. 13, 14, 27.  In a letter, dated December 9, 1998, the Debtor, on behalf of the Corporations, promised Ng that "all our corporations" would be responsible to pay back the open invoices due to Charming Trading.  In what may have been an inducement to continue doing business with the Corporations, the Debtor represented to Ng that "we have many other suppliers to support the repayment of Charming Trading open invoices."  Exh. 14.  However, when questioned at trial as to the identity and nature of the business conducted with those other suppliers, the Debtor could not recall the names of those suppliers or the magnitude of the business conducted with them.

Tr. 9/21/10 at 8-9; 36-37; 74-75.  Exhibit E is the general ledger created by Mr. Portnoy in

2004/2005 based upon the Corporations' check stubs.  This document shows payments made by

Just I for the "costs of goods sold" which would presumably have provided evidence of the

Corporations' other suppliers.  The document shows only *de minimis* payments to suppliers other

than Charming Trading in 1998, and belies the Debtor's assurances to Ng in his December 9,

1998 letter.  Exh. E at 469.

        As this Court previously stated, the Plaintiffs need not prove the elements of actual fraud

in order to succeed in piercing the veil.  The evidence must show that the Debtor committed a

fraud *or other wrong* which resulted in the Plaintiffs' unjust loss or injury.  The Court finds that

the Plaintiffs have sustained this burden.  The totality of the circumstances surrounding this case

show that the Debtor, as the sole actor on behalf of his Corporations, employed a scheme

designed to deflect all financial responsibility for goods shipped from the Chinese manufacturers

to the Corporations.  This Court believes that this is the type of conduct that should not be

insulated by utilizing the protection of a corporation and is what the veil-piercing theory

developed under New York law was designed to protect against.  The Debtor protests that the

Plaintiffs purchased the goods on their own credit, at their own peril and not at his direction, but

the Court finds it more likely that it was entirely the Debtor's intention that Plaintiffs extend

their own resources to purchase the goods.  Although it may have been the Debtor's earnest

intention that the Corporations would repay the Plaintiffs, that intention was not supported by

any financial reality.  The Court finds that the Corporations, at the Debtor's direction, entered

into a series of transactions with the Plaintiffs which he knew, or should have known, the

Corporations could not honor.  *See Kittay v. Flutie New York Corp. (In re Flutie New York*

*Corp.)*, 310 B.R. 31, 61 (Bankr. S.D.N.Y. 2004) (veil pierced where, among other factors, principal "knew or recklessly disregarded the deleterious effects of their conduct . . .").

### *Conclusion*

For the foregoing reasons, the Court finds that the corporate veil should be pierced and the Debtor held liable for the Corporations' obligations to the Plaintiffs.  As such, the Plaintiffs' opposition to the Claim Objection on that basis, is upheld.  Further proceedings will be necessary to determine the amount of the Plaintiffs' claim, and whether it should be discharged.

A further hearing will be held on March 19, 2012 at 9:30 a.m., to address ramifications of this Decision and the process to move this case forward.  A separate order consistent with this Decision will issue forthwith.


Dated: Central Islip, New York
        March 2, 2012                         */s/ Robert E. Grossman*
                                              Hon. Robert E. Grossman, U.S.B.J.